Good morning, Your Honors. May it please the Court. I would like to reserve five minutes for rebuttal, if I may. Yes. Thank you. The primary issue in this case is, of course, primary assumption of risk. And the key question arising with that regard is to whether or not the risk that resulted in Jessica Gregory's death was obvious. The answer, I believe, depends on how one defines the risk. The district judge said the risk was obvious because sliding beyond the boundary and impacting objects is an inherent risk of snowboarding. Thus, the judge defined the risk as sliding beyond the boundary, falling and sliding. I believe that was wrong. I believe the risk that led to Jessica's death was the risk of being misdirected into the backcountry by inaccurate signage and thereby being exposed to the hazards of the backcountry. That is not an obvious risk under California law. The Benenati case, that's the Burning Man case that came out in 2009, says that an obvious risk under California law is a risk that is, quote, within the contemplation of the activity. It is not within the contemplation of ski resort users to be misdirected into the backcountry by inaccurate signage. It is not within the contemplation of ski resort users to be misdirected into the backcountry by inaccurate signage. So let me ask you this. Even assuming that the boundary was mismarked or the boundary was wrong, that that area of the, what was it, the high beaver traverse was actually outside the boundaries. From reading the briefs, it appeared to me, and correct me if I'm wrong, that this would just be a technical error because, in fact, Alpine Meadows treated this area as if it were within the boundaries. They patrolled it. They reviewed it. They had signage that was consistent with their others. So even if it were, which is, I guess, a disputed issue, what difference does it make if the property was treated as if it were not backcountry? Actually, the property was treated differently at the high beaver traverse. There was a critical way in which there is substantial evidence that Alpine Meadows treated the high beaver traverse differently than other portions of the ski resort. Well, than other portions of the ski resort, but was it not treated at all as if it were backcountry? I mean, that seemed to be the issue. There was, in one critical difference, it was treated as backcountry. The Alpine Resort Ski Boundary Policy says within the resort, we mark, we give warnings of hazards. Specifically, the boundary policy says Alpine Meadows takes no measures within the out-of-bound area to warn or alert skiers or boarders to the hazards which they might encounter. Now, as for witness Stanley Gale presented a declaration, this is at page 298 of the excerpt of record, in which he said this, I'm quoting, During the 2005-2006 ski season, Alpine Meadows did identify cliffs and other hazards within the ski area boundary, both on its trail map and on the mountain, for customer safety. It did not do so on the HBT, that's the high beaver traverse. That's the critical difference in this case. Alpine Meadows put no hazard signs on the high beaver traverse, thereby treating it as it treated out-of-bounds areas. That's the factual difference there. So that's true also on the beaver bowl. Is that correct? Because further on in Mr. Gale's deposition testimony, it says there were no, there was no hazard signs in the beaver bowl. So is your argument that the beaver bowl is also outside the boundary? No. The beaver bowl is treated as an adventure zone. And I believe that the patrons were warned, if you go here, this is what you are going to encounter, something very adventurous. They were not warned of that on the high beaver traverse. This was just simply a way to get from point A to point B with no warnings whatsoever. Another way in which it was treated differently is it was not groomed all the way up, where Jessica Fell was never groomed. Alpine Meadows groomed this traverse up to a point and then stopped the grooming, almost like an invitation. Here's a road, go walk down it. No warning at all that the road's going to end. And then you're on your own. So this was the, this area, this high beaver traverse, your view is that unlike any other area, inbound area that would be a traverse area, I guess, this one did not have the hazards marked. Is that what you're telling us? Yes, there was substantial evidence to that effect, and it's what I just read from Mr. Gale. And that was Mr. Gale's testimony? Yes, his declaration. Declaration, you're saying. His declaration, page 298. It did not do so on the HBT. That's the difference. This was backcountry in that respect. No warning signs. No warning that there was a cliff off to the left. What's the state of the record with respect to the difference between the conditions in the ski area that's adjacent to the area you're talking about and the backcountry area? Well, the backcountry's utterly natural. No, I understand that. But, I mean, in terms of the conditions that day, I assume that even if you had warnings, you still have ice on the, conditions were essentially the same. Oh, the conditions where she fell was, I believe it was, it was firm with a very, a crust with a very light layer of snow on top. It was, and it was as the Sierra often gets. Yeah. Cement underneath a little bit of powder. But she was in the backcountry, and she didn't know it. That's the key to this case, I believe. She was exposed to backcountry risks without knowing it. That, under the Beninati case, is not an obvious risk. Is there anything else in the record? I'm reading this paragraph 48 that you pointed to in your grade brief, and it says that during the 2005-2006 ski season, Alpine Meadows did identify cliffs and other hazards within the ski area boundary, both on its trail map and on the mountain for customer safety. It did not do so on the HBT. Is that the part of the declaration that you're pointing to? Yes. And is there anything else in the declaration or in the record that would say more expressly what you're telling us now, which is that Alpine Meadows treated HBT differently than it did any other part of the within bounds area? I believe the boundary policy itself. This is the written boundary policy that's made available to users. It's in the excerpt of the record at page 66, and it says, Alpine Meadows takes no measures within the out-of-bound areas to warrant or alert skiers' borders to the hazards which they might encounter. And there's other evidence in the record that indicates they do warrant a hazard within these ski resort borders. So combining the ski resort border policy with Mr. Gale's testimony, we end up with High Beaver Traverse being treated differently. Okay. But there's nothing that says other traverses or other areas. This was the only area that wasn't? And do you have any other questions for Mr. Gale about this? Or is there something else in the record? Again, from a declaration by Mr. Gale, the ski resorts commonly mark hazards within the boundaries and do not mark hazards outside of boundaries. That's a previous page of his declaration. So it would be F Circuit Record 297, paragraph 42. Well, what I took from the Goldstein deposition, and you can kind of correct me if I'm wrong, is that I take your point that they didn't mark it with a warning. But what I took from the Goldstein deposition is they just didn't open the area at all if the ski patrol thought that it was hazardous to the public. I'm sorry. The Goldstein deposition? Yes. And the Goldstein affidavit. What I took from that affidavit was that they may not have marked it, but they just simply didn't open it at all if the conditions were hazardous to the public. It was open and shut. It was binary. Yeah, exactly. Open and closed. That was it. It was open. I mean, I think as Judge Akuta said, I don't think there's a dispute about that, that they actually did manage this area in some fashion in the same way that they managed the other part of it. They patrolled it. They swept it. They decided whether to open and close it. There's one critical thing they didn't do. They didn't warn of hazards. In that respect, they treated it like the backcountry, and it was a hazard of the backcountry that led to Jessica's death falling off a cliff. Help me explain, because I seem to remember that the opposing counselor from the record that there was a series of signs at the – in the Traverse indicating don't go past this sign. Is it your view that that is not a hazard warning? Or what's the effect of that series of signs? If Your Honor is referring to the signs posted on the tree that said this is the border of the resort. There was a series of signs. Yes, yes. And that was the inactive marking. Those signs were several hundred yards on the wrong side. Right, but Alpine Meadow, whether or not that is the border or not, which is in dispute, Alpine Meadow treated the area on its side. It assumed it was its side as being part of the resort, and so it had those signs saying don't – if you go past these signs, you're on your own. That is true. And so the hazard that should have been warned about wasn't – weren't those signs saying outside here, you're on your own? Because the hazard, I guess, here was the cliff, which was on the other side of those signs, if I'm reading the record correctly. I think another way of putting that is if she had been inbounds and slipped and fallen and slid out of bounds into a hazard, would she have assumed the risk? I believe the answer to that question is yes. One could reasonably expect that sort of thing could happen in a ski resort. But she was not inbounds. She was on the other side of a boundary marker that means something. It means this is the back country. I don't think the ski resort can claim the protection of a skier being inbounds in a situation like this when there is substantial evidence that she was, in fact, out of bounds. And the bigger – You have about four minutes left. Do you want to reserve some time for rebuttal? Yes. All right. Thank you. Good morning, Your Honor, and may it please the Court. Paul Killian for Appellees, Alpine Meadows Ski Corporation and the Powder Corporation. Appellants characterize this appeal as primarily about primary assumption of risk. We look at this as being also about express assumption of risk and the release that Jessica Gregory signed in conjunction with obtaining her season pass. That release alone provides a basis to affirm the summary judgment below. Jessica Gregory did two things in that release. She expressly assumed all risk of injury or death from snowboarding inbounds or out of bounds. And second, she expressly released Alpine Meadows from all liability for her injury or death arising from her participation in the sport of snowboarding and her use of Alpine Meadows facilities regardless of cause, including Alpine Meadows' alleged negligence. And that applies also inbounds or out of bounds. So this entire dispute that they're trying to create as to the boundary is completely addressed in the express release. And California courts have repeatedly upheld recreational releases in the sports context. Well, the argument, as I understand it, is if, even if you sign a release, if you think you're going down a bunny slope and the, in fact, it's totally natural territory with all the hazards and nothing has been corrected, it may not be something that you've released no matter how express your release is in that context. Well, there's no case that supports that view in California. I suppose. But, you know, I guess I'm kind of of that view, too. It just seems to me that although California law has an extended tinkle to the sports context expressly, there seems to be the reservation that Judge Acute is talking about, that if you've got an unusual hazard, it's outside the scope of the release, which seems sensible to me. Well, this is not an unusual hazard. Well, isn't that the whole case? I mean, is this a usual hazard or not a usual? I mean, if it's a usual hazard, either a primary assumption risk or under the express assumption risk, you prevail. If it's an unusual hazard, as the plaintiffs claim, then it's different, right? Isn't that what the whole case is about? Not as far as the application of the express release, no. And California courts are very clear that in a recreational sports context, express releases will be upheld. Here, it's undisputed Jessica Gregory was an experienced snowboarder. It's undisputed she had hiked the traverse before. It's undisputed she had ridden the Summit 6 chair to the top of this 8,500-foot ridge before. It's undisputed she passed a sign at the bottom of the lift that said the lift is not for beginners. In fact, she was on her way to double black diamond territory in Alpine Meadows. That's the most extreme territory on the mountain. And she also passed a sign, as Your Honor mentioned, that said, if firm conditions exist, a fall could result with an uncontrollable slide. And tragically, that's exactly what happened to Jessica Gregory. What were the measures that were taken over the High Beaver Traverse? You're maintaining that this traverse was patrolled. You've talked about that and so forth. But Gregory is saying that, in fact, this was not treated fully as inbound territory. It was treated, it was patrolled and controlled by Alpine Meadows, and that's what the purpose was of the operational boundary. I think the extent of the operational boundary is summarized best, frankly, from the plaintiff's key witness, Joe Gaffney, who said, this is an excerpt of Record 120, that the out-of-bounds area is the area where the resort doesn't maintain or control and peruse the area. And, in fact, it's uncontroverted that Alpine Meadows patrolled and controlled the entire High Beaver Traverse. Appellants argue that the High Beaver Traverse was not groomed. It wasn't supposed to be groomed. In fact, again, it's undisputed Jessica Gregory had hiked the traverse before. She would have known that. Are there other areas within the Alpine Meadows ski area that are inbounds but not groomed? Yes, there are. And, in fact, Alpine Meadows has what's called adventure zones. And, in fact, Jessica Gregory was on her way to this double black diamond area, these adventure zones that are not groomed like a bunny slope. It's double black diamond territory. That's the sport here.  She wasn't doing that at the time of the accident. She was just trying to get over to the place where she could challenge herself. She was traversing. That's a whole different – to me, that's a different concept. Yes, she was on her way to the black diamond territory, but the cause of her fall was the same kinds of inherent risks that exist no matter what side of the boundary you're on. And that's the problem with the plaintiff's case. And that's what the district court held. The problem with plaintiff's evidence is that even if defendants did not accurately mark the ski area boundary and they failed to adequately maintain the area that was out of bounds, these actions seem not to have increased the risks of the sport. The location of the boundary in this case is immaterial, because whether Gregory fell within or outside the boundary, sliding beyond the boundary and impacting objects is an inherent risk of the sport. That inherent risk exists on either side of the boundary. That's what caused the death here. She was walking along the traverse. Eyewitnesses said it appeared that she dropped her snowboard as she reached for it. She lost her footing, went down the slope. Gravity did the rest, and she collided with rocks at the bottom. That risk, that's an inherent risk in the sport, and that risk exists on either side of the boundary. The boundary is really immaterial. And again, the express release applies whether Jessica was in bounds or out of bounds. And she released alpine meadows of liability for whether or not she was in bounds or out of bounds, and she assumed the risk of injury whether she was in bounds or out of bounds. So if I'm understanding your argument correctly, you're saying that the paragraph that opposing counsel is pointing to in Mr. Gale's declaration that the signage was different in this high beaver traverse is essentially irrelevant, whether it was or wasn't. You're saying that doesn't make a difference. Is that correct? That is correct. And that's California's assumption of risk law. Under California's assumption of risk law, the alpine's duty is not to increase the risk inherent in the sport. There's no duty to decrease those risks, and there's no duty to mitigate those risks. And a sign in and of itself isn't the cause of anything. It simply informs a patron about risks. And so the alpine's duty is not to increase the risk inherent in the sport. It's not to mitigate those risks. But the risk that she encountered when she participated in the sport is losing one's balance, falling, sliding down a hill, impacting objects below. Those are the inherent risks, and those risks exist on either side of the boundary. They're the same. The plaintiff's – there's a problem with the plaintiff's argument here. On the one hand, they describe the traverse as dangerous backcountry, and they claim that Jessica would not have knowingly gone into such terrain. But on the other hand, it's undisputed that Jessica, in fact, had hiked the traverse before. It's uncontroverted in the record that her companion, Joe Gaffney, had hiked the traverse earlier that same day. And that's a supplemental excerpt of Record 72. And it's also undisputed that she passed a sign at the bottom of the lift that told her, firm conditions exist. A fall could result with an uncontrollable slide. Part of the sport is being aware of the surroundings and the terrain. And that was – that's stated probably best in the Solis case. Skiers, particularly experts, are or should be aware that slopes change either by natural forces or by man, and that skiers must ski with vigilance, alert to unexpected dangers. That is part of the sport. So there was no obligation, no duty on the part of Alpine Meadows to put a sign up marking this cliff. And in fact, even plaintiff's own expert conceded that Alpine Meadows had no duty to mark cliffs that were out of bounds. And here it's undisputed that this rock outcropping was outside the posted operational bounds. Were there special duties created by the special use permit? Not with regard to posting any signs. There really were no – the special use permit is simply the lease between the Forest Service and Alpine Meadows. And nothing in the special use permit says anything about posting signs. It references – or it says that Alpine Meadows has to put an operating plan together that has to have a section on boundary management, but that's all it says. You look at the operating plan, it doesn't require the posting of boundaries. What the appellants are pointing to is an internal policy document called the boundary management policy. If you look at that, that does not even have a section that requires posting of signage. The other thing about the operating plan is it does not apply to Section 7 where this accident occurred because that's owned in fee simple by Alpine Meadows and it lists the sections it applies to and Section 7 is not included specifically. I see my time is just about up. We ask that the judgment be affirmed. All right. Thank you for your argument. Thank you. The honors, just briefly and quickly, the special use permit actually does require, and I quote, this plan shall consist of the following sections in an operating plan, including boundary management. The boundary policy, which is made available to all skiers, says quite plainly, the ski area boundary is delineated by signs placed along the boundary. So the boundary policy is part of the operating plan, which is required by the special use permit, which is required by the federal regulation, which is authorized by the federal statute. So what we all get back to eventually is a violation of statute and regulation by virtue of mismarking of the boundary. If the technical boundary was mismarked, is there any causation break there? Well, unfortunately and sadly, Jessica Gregory is not around to tell us whether or not she would have gone there. But we do have Joseph Gaffney, who said, I don't go out of bounds without a probe, a beacon, and a snow shovel. And I did not go out of bounds knowingly that day. If he wouldn't have she following behind him, it may be inferred, would not have. That's substantial evidence of causation. So opposing counsel makes the point that, or he says it's undisputed that she had traversed this area before. Why should that make any difference at all? Does that make a difference? No. It's irrelevant. So she knew what the risks were for this particular piece of land, whether it was in bounds or out of bounds. No. No matter how many times she was out there, she didn't know that the signs were, that the boundary was mismarked and she was out of bounds. That was the risk. Though I guess your point, though, is if she had known that was out of bounds, she wouldn't have gone there. And yet she, she, whether or not she knew whether the boundary was technically mismarked, she had already gone there and was aware of it. So the concern that I don't want to face the risks that are brought, the natural risks of out of bounds territory seems to be not present if she was familiar with that area. No, because she had no idea it was out of bounds. And even if she'd been there previously, there was no indication that she was going out of bounds. If there had been a sign that said from this point on, you're going out of bounds. Gaffney wouldn't have let her there because he did not have a beacon, a snow shovel or probe. He testified to that effect. She was with him. She was following him. It may be inferred that she would not have gone there either. And it doesn't matter how many times she'd been there. If every time this area boundary was mismarked. I mean, I gather your argument is that sure, she might have been there before, but the conditions were safe. So no one paid any attention to it. And in fact, if it had been marked, she would have had the opportunity to go or not go. She would have had the opportunity to make a choice whether to be there or not. I mean, the difficulty, the difficulty of this case to me, that's a you know, if we get past that's a trial issue. I mean, if whether she's been there or not, this is summary judgment. Yes. But the difficulty is that you do have conditions that are relatively. It seems from my dispute that conditions are relatively the same, whether it's in boundary or out of boundary. And that that would seem to be sort of the normal risk that falls in the primary assumption of risk here. That's the that's a difficult. I don't see any evidence that there was a shift, for example, like a like a. As you go across the boundary, that all of a sudden you had a fall that was unexpected or a deadfall or something like that where you went through. The critical difference was not in the shift in terrain. It was a shift in the way Alpine Meadows treated that area. No warning signs and no warning that there were no warning signs. More importantly, she knew in Beaver Ball, Estelle Ball, there would be no warning signs. She didn't know that here. There was no warning that there would be no warning signs. There were no warning signs. She had no idea. That's your contention that she treated this or that rather than Alpine Meadows treated this as backcountry and therefore she was misdirected. To the extent there were no warning signs. Yes. They treated it like backcountry to that extent. They did patrol it. They did sweep it. They did open or close it. But they did not put warning signs of hazards and they did not warn that you were in the backcountry. At least they didn't want it properly. That's the difference in this case. And it's what makes it so unusual. This really is an unusual case. I'm confident in saying there hasn't been one like it before and there won't be one like it again. This is unusual. Thank you, counsel. The case just heard will be submitted for decision.
judges: Settle, Thomas, Ikuta